## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**AMERICAN NATIONAL PROPERTY
AND CASUALTY COMPANY a/s/o PAUL COLVIN**                    **PLAINTIFF**

**VS.**                    **CASE NO. 5:18-CV-5250**

**BROAN-NUTONE, LLC, and
A.O. SMITH CORPORATION**                    **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Before the Court is a Motion for Summary Judgment filed by Defendant A.O. Smith Corporation (Doc. 49). Defendant Broan-Nutone, LLC filed a Motion for Summary Judgment and to Adopt by Reference A.O. Smith's Motion (Doc. 52).[1] Plaintiff American National Property and Casualty Company ("ANPAC") filed a Response in Opposition to each motion (Docs. 58 & 61, respectively).[2] Broan-Nutone filed a Reply (Doc. 65). For the reasons below, Defendants' Motions (Docs. 49 & 52) are **DENIED**.

### I. BACKGROUND

On October 9, 2017, a fire broke out at a combination residential and commercial structure owned by Paul Colvin, located on Harmon Road in Fayetteville, Arkansas. Mr. Colvin had an insurance policy with ANPAC, which made payments to him for damage to the building caused by the fire. ANPAC, as subrogee of Mr. Colvin, now brings suit against Defendants A.O. Smith and Broan-Nutone. ANPAC alleges that the fire was started by a faulty exhaust fan, which had been installed in a bathroom in the commercial portion of

---

[1] A.O. Smith and Broan-Nutone each filed memorandum briefs in support of their motions (Docs. 50 & 53, respectively) and statements of facts (Docs. 51 & 54).

[2] ANPAC also filed memorandum briefs in support of each response (Docs. 59 & 62) and responses to each statement of facts (Docs. 60 & 63).

the building in 2011 or 2012. It is undisputed that Broan-Nutone manufactured the exhaust fan, and ANPAC alleges that A.O. Smith manufactured the motor that was used in assembling the fan. In its amended complaint, ANPAC brings claims against both Defendants on theories of strict liability, negligence, products liability, and breach of warranty.

The building on Harmon Road included both Mr. Colvin's residence and warehouse space in which Mr. Colvin stored items and sometimes conducted auctions. The warehouse portion of the building contained a bathroom available for public use. Along with a sink and toilet, the bathroom contained a lawyer's bookcase to the right of the sink and a stand next to the toilet. The bathroom may also have contained a waste basket. In the ceiling of the bathroom there was a light and an exhaust fan, not combined into one unit but operated by the same switch in the bathroom wall. After the fire, the remains of the bathroom fan were discovered at the bottom of a pile of debris. Above the bathroom was a platform on which Mr. Colvin kept sound equipment associated with his auction business, including an amplifier and a receiver box for a cordless microphone, which were both plugged into a power strip.

Dennis Ledbetter, the Washington County fire marshal, investigated the cause and origin of the fire to determine whether the fire was accidental or intentional. (Doc. 50-1, p. 108, depo. 9:5–20). Having determined that the fire was a civil matter, not a criminal one, Mr. Ledbetter left everything as untouched as possible in case privately retained experts were hired to examine the scene. *Id.* at 109, depo. 10:9–22.

Mr. Ledbetter's thinking proved correct: The day after the fire, ANPAC sent John Jenkins, a fire investigator, to examine the scene as an expert on fire origin and cause. Mr. Jenkins visited the site of the fire with Mr. Ledbetter, examined and photographed the

2

scene and relevant debris, and interviewed both Mr. Colvin and Tammy Preston, who also lived there.[3] Mr. Jenkins concluded that there were wiring and electrical components in the area of origin he identified that warranted further expert examination. On October 13, 2017, he returned with David Montague, an electrical engineer hired by ANPAC to determine if electrical activity or malfunction was present and a competent ignition source for the fire.

Over the course of these two visits, the fire marshal and ANPAC's experts combed through the scene of the fire. As a consequence, when a representative of Broan-Nutone visited the Harmon Road building with the company's own fire investigator, Jim Kuticka, on October 31, Mr. Kuticka was not able to observe the fire debris and wiring as it was immediately after the fire. He and the fire investigator hired by A.O. Smith, Cory Reeves, relied on reports, depositions, and photos of the scene in forming their expert opinions. A.O. Smith also retained Thomas Bajzek as an expert electrical engineer. Mr. Bajzek examined artifacts that were recovered from the scene, including circuit wiring and what remained of the bathroom fan, but could not visit the scene to examine anything else that had not been retained for inspection.

Defendants assert that they are entitled to summary judgment because ANPAC cannot show by a preponderance of the probabilities that the subject exhaust fan was the proximate cause of the fire at Mr. Colvin's property. In particular, Defendants point out

---

[3] During her deposition two years later, Ms. Preston indicated that she did not believe she had been interviewed by anyone or spoken to anyone at the scene in the days after the fire. See Doc. 50-5, pp. 35–36, depo. 34:24–35:5; p. 41, depo. 40:1–5. Mr. Jenkins, however, indicated in his report and during his deposition that he spoke with Ms. Preston on October 10. See Doc. 50-2, pp. 17–18, depo. 61:3–15 & Doc. 50-1, p. 8 ("Ms. Preston is a smoker and stated . . . ."). At summary judgment, the Court must view the facts in the light most favorable to ANPAC and will therefore assume that the conversation took place as Mr. Jenkins describes.

that ANPAC's experts have not identified a particular defect in the fan or its motor that caused the fire. Defendants also argue that there is a lack of evidence to establish that the defect existed at the time the fan left Defendants' control. In response, ANPAC asserts that there is ample circumstantial evidence for a jury to find by a preponderance of the probabilities that a defect in the subject fan motor existed when the fan left the Defendants' control, the fan's motor was the proximate cause of the fire, and summary judgment should therefore be denied.

## II. LEGAL STANDARD

The standard for summary judgment is well established. Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

To prevail on a product-liability claim at trial, the plaintiff would have to show that (1) the supplier is engaged in the business of manufacturing, assembling, selling, leasing, or otherwise distributing the product; (2) the product was supplied by him or her in a defective condition that rendered it unreasonably dangerous; and (3) the defective condition was a proximate cause of the harm to a person or to property. Ark. Code Ann. § 16-116-101(a). "It is not necessary to establish these elements by direct proof; circumstantial evidence will suffice. Nor is it necessary to offer proof beyond a reasonable doubt. However, if direct proof is lacking, a plaintiff must negate other possible causes of the accident by a preponderance of the probabilities." *Yielding v. Chrysler Motor Co.*, 783 S.W.2d 353, 355 (Ark. 1990) (citing *Harrell Motors, Inc. v. Flanery*, 612 S.W.2d 727 (Ark. 1981)). "[W]hen common experience teaches that an accident would not have happened in the absence of a defect, a case may sometimes be allowed to proceed to a factfinder" provided that the plaintiff can "produce evidence that tends to negate other causes of the observed failure." *Crawford v. Sears Roebuck & Co.*, 295 F.3d 884, 886 (8th Cir. 2002) (applying Arkansas law) (internal quotation marks omitted). However, summary judgment is appropriate where "there was no evidence tending to eliminate other possible causes for the failure." *Id.*[4]

---

[4] Defendants do not distinguish among ANPAC's claims for relief. Instead, they assert that each claim "requires *at least* proof of product defect and proximate causation." (Doc.

## III. DISCUSSION

Defendants challenge the sufficiency of the evidence to establish that the bathroom exhaust fan was the proximate cause of the fire. ANPAC is explicit that it intends to rely on circumstantial evidence to make its case in this matter. Therefore, the question before the Court at summary judgment is whether, viewing the record evidence in the light most favorable to ANPAC, a reasonable jury could find that Plaintiff has negated other possible causes of the fire by a preponderance of the probabilities. The Court concludes that the answer is yes.

When ANPAC's experts in this case set about trying to determine the cause of the fire at Mr. Colvin's property, they began with many hypotheses about possible sources of the fire. The fire might have been set by a disgruntled customer or member of the community where Mr. Colvin was mayor; it might have been the result of carelessly discarded smoking materials; it could have been sparked by faulty wiring in the walls; the sound equipment or power strip located on the landing above the bathroom might have been the source of the fire; or it might have been ignited by a malfunction of the bathroom exhaust fan.

As the experts reviewed the physical evidence, they were able to eliminate some of those hypotheses. For example, Mr. Ledbetter was able to rule out the possibility that the fire was started intentionally. Mr. Ledbetter testified in his deposition that he did not observe any evidence that the fire was set. *See* Doc. 50-1, p. 109, depo. 10:12–13.

---

50, p. 8 n.7). Since Defendants challenge *all* claims against them on those grounds, the Court will address only the sufficiency of the evidence as to defect and causation and will not explore any other elements of any of the claims.

Additionally, the premises were searched by a dog trained to alert to the presence of accelerants, and none were detected. *Id.* at p. 111, depo. 12:2–5.

The experts were also able to eliminate the possibility that the fire was started by a discarded cigarette. Both Mr. Colvin and Ms. Preston reported being smokers, but both testified that they smoked only outside and certainly did not smoke in the bathroom that morning. (Doc. 50-4, pp. 27–28, depo. 104:25–105:21; Doc. 50-5, pp. 27–28, depo. 26:16–27:10). Additionally, Mr. Jenkins observed smoking materials outside the building but none inside. (Doc. 50-1, p. 8). He was further able to rule out improperly discarded smoking materials as a possible cause of the fire because he did not find evidence of smoking materials in the bathroom, nor did the fire damage correspond to what he would have expected to observe if the fire had started in the bathroom trash can. *Id.* at p. 13.

ANPAC's fire investigator also eliminated the sound equipment and power strip located on the landing above the bathroom as a possible source of the fire. In his deposition, Mr. Jenkins was asked, "How could you rule out that hypothesis, that something caught fire on the platform and that's what started the fire?" (Doc. 50-2, p. 31, depo. 114:20–22). He responded,

> The beveling and the level of damages to the lower portions of the bathroom versus the other. Had the fire originated on the OSB platform, it should have widely spread across the platform. There should have been beveling and fire damage in reverse of what I was looking at. The fire from lower to upper versus upper to lower.

*Id.* at depo. 114:23–115:4. The attorney then specifically asked Mr. Jenkins on what basis he was able to rule out the "eastern corner right above that lip where the bathroom sticks out" and "on top of the platform" as points of origin of the fire. *Id.* at p. 32. Mr. Jenkins affirmed that he was able to rule those locations out "based on the physical evidence." *Id.* In his report, Mr. Jenkins concluded that the "analysis of these fire effects and the resulting

7

movement and intensity patterns formed during the progression of the fire established the spread of fire from the confined ceiling area of the subject bathroom, both upward, lateral and downward." (Doc. 50-1, p. 12).[5]

Within the area of origin identified by Mr. Jenkins, Mr. Montague considered the possibility that the fire was caused either by a problem with the structural wiring or by a malfunction internal to the bathroom fan.  Mr. Montague was able to eliminate the structural wiring in the bathroom as a possible cause of the fire. He collected structural wiring from the area of origin and concluded that there was no electrical activity on that wiring. (Doc. 50-1, p. 58). In Mr. Montague's expert opinion, if the fire had started external to the fan, there would have been electrical activity present on the structural wiring, whether the switch was turned on or off. Since he found no electrical activity on the structural wiring, he eliminated an electrical cause external to the fan. *Id.* at 60. Having thus eliminated one hypothetical source of the fire, Mr. Montague concluded:

> The combined findings of the fire originating where the fan was located, the fan's post-fire location on the floor under fire debris, the always-on structural wiring from the ceiling area of the subject bathroom, as well as the switched portion of the circuit serving the light fixture and exhaust fan, exhibiting no evidence of electrical activity would be indicative of an internal failure of the exhaust fan causing this fire.

(Doc. 50-1, p. 60). In other words, the evidence was most consistent with the exhaust fan being the cause of the fire.

---

[5] Mr. Montague did not examine electrical items on the platform because it was outside of the area of origin that had been identified by Mr. Jenkins. When asked about the power strip on the platform and the outlet into which it was plugged, Mr. Montague stated that while he did "look around the perimeter [of the area of origin] for anything that would be of interest," he did so only "to the extent that I felt was prudent" so as to be "prudent with the client's money and not go and do a bunch of whatever that's not necessary." (Doc. 50-3, p. 37, depo. 134–35).

Mr. Montague acknowledged during his deposition that the fan could only be the source of the fire (a "common ignition source") if it were energized—that is, turned on—at the time of the fire. *See* Doc. 50-3, p. 39, depo. 144:23–145:2. Defendants point to the subsequent deposition testimony of Mr. Colvin and Ms. Preston that if the light and fan had been turned on at the time, they would have noticed and turned it off as evidence that the fan was not energized at the time of the fire. *See* Doc. 50-4, p. 28, depo. 106:11–14 ("Q: As you sit here now, can you say whether the bathroom fan and light was on at the time of the fire? A: I don't think it was, because that door is usually open. So I would have seen and heard the fan, I would have thought."); Doc. 50-5, p. 25, depo. 24:3 – 7 (Q: I also assume you did not notice the bathroom light on or the fan on? A: Correct. Q: And if the bathroom light and the fan were on— A: I probably would have turned it off."). However, Mr. Jenkins's report, on which Mr. Montague was entitled to rely in forming his own opinions, indicated based on his interview with Mr. Colvin that the owner "was unsure of the last person to have been inside the bathroom and could not confirm or exclude if the ceiling mounted light fixture or recessed bathroom vent fan was 'on or off,'" nor could Mr. Colvin "recall if the bathroom entry door was 'open or closed' prior to his departure." (Doc. 50-1, p. 8). At the summary judgment stage, the Court is required to view the facts in the light most favorable to the non-moving party and therefore concludes that Mr. Colvin's statement to Mr. Jenkins in the days immediately following the fire, in combination with the expert opinions described above, would allow a jury to conclude that a failure of the bathroom exhaust fan was the most likely cause of the fire and that Plaintiff had negated other possible causes of the fire by a preponderance of the probabilities.

Of course, the Court recognizes that Defendants' experts disagree with Plaintiff's experts' conclusions. Mr. Kuticka rejected Mr. Montague's conclusion as "simple

9

speculation unsupported by scientific evidence," (Doc. 58-5, p. 10), and he concluded that the data was "scientifically insufficient to accurately and scientifically establish the actual fire origin of this fire or the competent ignition source or first material ignited." *Id.* at p. 20. Mr. Bajzek disagreed that it was possible to conclude none of the branch circuitry was energized because some portion of it was not collected. (Doc. 50-6, pp. 66–67). However, weighing the relative credibility of dueling experts is a matter for the factfinder at trial, not one that can be resolved by the Court on a motion for summary judgment.

Defendants have pointed to specific gaps in ANPAC's experts' theory of the fire that they argue must be fatal to Plaintiff's claims. The Court disagrees. First, Defendants emphasize that ANPAC's expert electrical engineer, Mr. Montague, did not identify a specific defect in the fan that caused the fire. (Doc. 50-3, p. 39, depo. 145:3–11). However, it is not necessary for ANPAC to identify the specific defect that caused the fire. Under Arkansas law, a plaintiff "is not required to prove a specific defect when common experience tells us that the accident would not have occurred in the absence of a defect." *Williams v. Smart Chevrolet Co.*, 730 S.W.2d 479, 482 (Ark. 1987). The Court recognizes that "[t]he mere fact of an accident, standing alone, does not make out a case that the product was defective," *id.*, but a plaintiff may avoid summary judgment by "establish[ing] that this is the type of case where an accident would not have occurred absent a defect and that the circumstances support an inference of liability" for the defendant. *Ruminer v. Gen. Motors Corp.*, 483 F.3d 561, 565 (8th Cir. 2007) (applying Arkansas law). In *Ruminer*, the Eighth Circuit was not convinced that standard had been met because "common experience does not dictate that if an individual is injured in a car accident, the injury is most likely a result of a defect in the automobile's occupant protection system" rather than driver error or some other cause. *Id.* Here, in contrast, other possible causes

10

of the fire can be eliminated by expert testimony, as described above, and the jury's "common experience" with bathroom exhaust fans could lead jurors to conclude that the fan would not have started a fire absent a defect.

There is also sufficient circumstantial evidence for a jury to determine that any defect in the fan existed at the time it left Defendants' control. In arguing to the contrary, Defendants point to cases in which there were obvious ways the alleged defect might have been introduced after the product left the manufacturer. In *Yielding v. Chrysler Motor Co.*, for example, plaintiffs alleged that their car accident was caused by a specific defect within the transmission. 783 S.W.2d 353, 355 (Ark. 1990). The evidence showed, however, that since purchasing the vehicle, plaintiffs had a mechanic disassemble the transmission in order to perform repairs, and therefore, the court held that there was no evidence to support a finding of liability for Chrysler. *Id.* at 356. Similarly, in *Campbell Soup Co. v. Gates,* the fact that the plaintiff found beetle larvae in a package of noodles she purchased at a grocery store was not sufficient to establish liability for the manufacturer where there was evidence that "[m]ore than a month elapsed between the dates of manufacture and purchase, during which period the product was transported [from] California to an intermediate storage site and then to the distributor in Missouri, who delivered it to [the grocery store,] where it was in stock for approximately one week" before it was purchased by the plaintiff. 889 S.W.2d 750, 754 (Ark. 1994). Since the plaintiff did not present sufficient evidence to negate the other possible sources of contamination, there could be no finding of liability for Campbell Soup Company. *Id.*

Here, the exhaust fan was installed in the ceiling of the bathroom when the building was constructed in 2011 or 2012, and there is no evidence that the fan had been altered in any way since it was installed. At his deposition, Mr. Colvin was asked in many different

ways the question "Do you recall ever touching that fan after it was installed?" and each time responded, "No." (Doc. 50-4, p. 24, depo. 89:7–9). Mr. Colvin also affirmed that when additional construction was done on the building, it did not impact the bathroom in the storage area. (Doc. 50-4, p. 34, 129:14–17). In about 2013, the bathroom doorway was widened and extended to comply with the Americans with Disabilities Act, but the only work that was done on the electrical system in the bathroom was to extend the circuit. (Doc. 50-1, p. 8). Since there is no indication that the fan was damaged or otherwise tampered with after it was installed, a jury could reasonably conclude that the fan was defective when it left Defendants' control.

Thus, the Court concludes that ANPAC has responded to Defendants' Motion with enough specific facts to allow a reasonable jury to conclude that Plaintiff has negated other possible causes of the fire by a preponderance of the probabilities and that the bathroom exhaust fan is therefore the most likely cause of the fire at Mr. Colvin's building.

## IV.  CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the Defendants' Motions for Summary Judgment (Docs. 49 & 52) are **DENIED**.

**IT IS SO ORDERED** on this ___ day of July, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE